**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Case No. 23 B 7153 |
| SPD II MAKAIWA RESORT DEVELOPMENT, LLC, | ) |
| | ) |
| | ) Chapter 7 |
| Debtor. | ) |
| | ) |
| | ) |
| 24 MEMBERS OF COCONUT BEACH/ HAWAII LLC, | ) |
| | ) |
| | ) Adv. No. 25 A 260 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Judge David D. Cleary |
| CORBAN KAUAI CHICAGO LENDER LLC, | ) |
| | ) |
| Defendant. | ) |

**ORDER DENYING MOTION TO DISMISS**

This matter comes before the court on the motion ("Motion to Dismiss") of Corban Kauai

Chicago Lender LLC ("Corban Kauai" or "Defendant") to dismiss the complaint ("Complaint")

filed by 24 Members of Coconut Beach/Hawaii LLC ("CBH" or "Plaintiff"). Plaintiff[1] filed a

response in opposition to the Motion to Dismiss ("Response"), and Corban Kauai filed a reply in

support ("Reply"). Having read the papers and reviewed the applicable case law, for the reasons

stated below the court will deny the Motion to Dismiss.

---

[1] The Complaint refers to the Plaintiff as CBH, *see* Complaint, ℙ 3, and also refers to the LLC as CBH, *see id.*, ℙ 15.
For purposes of this Order, this is a distinction without a difference, and the court adopts the same shorthand.

## I.   JURISDICTION

The court has subject matter jurisdiction under 28 U.S.C. § 1334(b) and the district court's Internal Operating Procedure 15(a).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).  Venue is proper under 28 U.S.C. § 1409(a).

## II.   BACKGROUND

In resolving a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the court considers well-pleaded facts and the reasonable inferences drawn from them in the light most favorable to the plaintiff.  *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010).  Every allegation that is well-pleaded by a plaintiff is taken as true in ruling on the motion.  *See Berger v. Nat'l Collegiate Athletic Ass'n*, 843 F.3d 285, 289-90 (7th Cir. 2016).  The court may take judicial notice of its own docket.  *See Collum v. City of Chicago* (*In re Collum*), 649 B.R. 186, 192 (Bankr. N.D. Ill. 2023).

SPD II Makaiwa Resort Development LLC ("Debtor") is a New York company previously[2] managed by Forefront EB-5 (HCR) LLC, managed by Jason Ding ("Ding") and Jeffrey Laytin ("Laytin").  Ding and Laytin are Debtor's principals.  Complaint, ¶¶ 1-2.

Plaintiff is a group of 24 members of Coconut Beach/Hawaii LLC, a New York company.  *Id.*, ¶ 3.

In other federal litigation, Ding and Laytin provided an accounting of how the Debtor acquired property in Kauai, Hawaii ("Hawaii Property").  *Dou et al. v. Carillon Tower/Chicago LP*, 18-cv-7865 (N.D. Ill.); *Li et al. v. Forefront EB-5 Fund (HCR) LLC*, 22-cv-7081 (N.D. Ill.).  Some of that accounting is on the docket in the underlying bankruptcy case.  *Id.*, ¶ 10 and Exhibit 1; Case No. 23 B 7153, EOD 365, Exhibit 1.

---

[2] At the time Plaintiff filed the Complaint, Debtor was a chapter 11 debtor-in-possession.  The court since converted the case to chapter 7.

In 2014, Ding and Laytin began collaborating on two projects, both of which ended in bankruptcy and lawsuits, the first being a Chicago apartment building ("Chicago Project"), and the second being a Hawaiian resort ("Hawaii Project"). Complaint, ¶ 12.

The capital stack for both the Chicago Project and the Hawaii Project had three levels: (i) an owner/developer would contribute the land itself and some equity; (ii) Chinese investors would contribute mezzanine debt; and (iii) a senior lender would provide most funds needed to build the structures. Ding and Laytin did not honor this structure of having each mezzanine lender make a loan directly to the owner/developer. *Id.*, ¶¶ 13, 19.

For the Chicago Project, the owner/developer was Symmetry Tower/Chicago Project Owner LLC ( "Chicago Project Owner") and the mezzanine lender was Carillon Tower/Chicago LP ("Carillon"). For the Hawaii Project, the owner/developer was the Debtor, and the mezzanine lender was Coconut Beach/Hawaii LLC ("CBH"). *Id.*, ¶¶ 14-15.

The Chicago Project was marketed first, with Chinese investors putting over $48,000,000 into a Carillon account from November 2015 to March 2016. The Hawaii Project was marketed later, with Chinese investors putting $26,400,000 into a CBH account from April 2016 to October 2017. *Id.*, ¶¶ 16-17.

The Hawaii Property was bought in April 2016 with $7,500,000 of Chinese money that could only have been sourced from investors in Carillon with funds earmarked for the Chicago deal. *Id.*, ¶ 18.

Ding and Laytin diverted all money that arrived for Carillon (and, later, all that came for CBH) to a heretofore unknown entity they controlled called Symmetry Property Development II LLC ("Symmetry II"). Symmetry II was a repository of diverted Chinese investor money, first holding Chicago money and then commingled Chicago and Hawaii money. *Id.*, ¶¶ 20-21.

3

The Hawaii Property was purchased on or about April 15, 2016, for $15,000,000, a sum that the Debtor raised by diverting/borrowing $7,500,000 from Symmetry II and borrowing $7,500,000 from an entity owned by JDI Realty LLC ("JDI").  This acquisition was structured so that only JDI, not Symmetry II, received a mortgage on the Hawaii Property for its loan of $7,500,000.  *Id.*, ¶¶ 22, 24.

JDI made a loan of $7,500,000 and received a mortgage worth $15,000,000.  The Chinese investors in Symmetry II also made a loan of $7,500,000 on the same day but received no mortgage and no collateral.  *Id.*, ¶ 26.

During the pendency of the JDI loan, additional funds were taken from Symmetry II to pay JDI.  *Id.*, ¶ 27.

In Spring 2017, the Debtor's principals sought a new lender to replace JDI's loan, which was maturing.  They looked for assistance from a friend and long-time affiliate of the Debtor, Kraig Danielson ("Danielson") of Corban Capital Partners LLC.  Danielson shared a lawyer with Debtor.  *See Corban Capital Partners LLC v. Corban Kauai Chicago Lender LLC et al.*, 23-cv-157 (N.D. Ill.).  *Id.*, ¶¶ 28-29.

Corban Capital Partners recruited Arena Capital Group to form Corban Kauai (the "Corban" in the name Corban Kauai Chicago Lender being derived from Corban Capital Partners LLC) to be the new lender that would take out JDI's position.  *Id.*, ¶ 30.

On May 23, 2017, Corban Kauai lent $6,500,000 to the Debtor in a refinancing transaction, paying off the JDI loan and vesting Corban Kauai with the sole secured position on the Hawaii Property.  *Id.*, ¶ 31.

Corban Kauai lent $6,500,000 on property worth more than $15,000,000 while the Chinese investors lent $7,500,000 for no mortgage or collateral.  *Id.*, ¶ 32.

Corban Kauai's loan to the Debtor was an insider loan by virtue of the benefit it bestowed on Danielson and also because it was part of a scheme whereby the insiders (Ding and Laytin) could deprive Chinese investors of collateral and thereby borrow more money on the Hawaii Property. Though not a direct lender to Ding and Laytin, Corban Kauai facilitated the process whereby they refused to treat Chinese investors equitably. *Id.*, ¶ 33.

Corban Kauai knew that Debtor was a start-up and not a going concern. Ding told Corban Kauai that its loan would be repaid with Chinese money if no senior loan was forthcoming. Ding testified:

> QUESTION: To your knowledge, did yourself or Mr. Laytin or anyone on the debtor side ever mention to Corban [Kauai] about the Coconut Beach/Hawaii, LLC loan?
>
> DING: Yes. We have discussed there's ongoing EB-5 [Chinese] raise, and it was our – that was a part of the entire capital stack of eventually the project will get to, and the construction loan and the EB-5 loan will be the way to pay it off. That's why they – they made the loan….
>
> QUESTION: So did these discussions take place before they made their loan to the [D]ebtor?
>
> DING: That's correct because they have to know how I intend to pay off this loan. Our intention to pay off the loan is with [a] construction loan and an ongoing EB-5 raise.

*Id.*, ¶ 34; Case No. 23 B 7153, EOD 135, Exhibit 1, p. 72.

Corban Kauai knew that the Hawaii Property was worth at least $15,000,000 yet had an encumbrance of only $7,500,000 because the Chinese investors were not granted a mortgage on their $7,500,000 loan from Symmetry II to the Debtor. Complaint, ¶ 35.

Corban Kauai was on notice that its loan held a preferential position because the Debtor withheld a mortgage favoring Chinese investors whose money the Debtor borrowed to buy the Hawaii Property. *Id.*, ¶ 37.

5

Corban Kauai knew from the Debtor's operating agreement that Symmetry II's capital contribution was $100.  Therefore, Corban Kauai cannot claim that the $7,500,000 from Symmetry II was a capital contribution to the Debtor instead of a loan.  *Id.*, ¶ 38.

The Hawaii Property should have been encumbered by a $7,500,000 mortgage in favor of Symmetry II at the same time as the JDI mortgage of $7,500,000.  Since it was not, Corban Kauai, as the subsequent lender, was afforded an outsized equity cushion and did not have to compete with a mortgage of equal standing, even though the Chinese investors had lent more money to the Debtor at an earlier time.  *Id.*, ¶ 39.

Corban Kauai took advantage of this collateral cushion by lending more money to the Debtor on July 25, 2018.  It increased its loan principal to $9,914,000 and filed an amended mortgage to reflect the increased balance.  Corban Kauai was able to fully secure this increase in principal because Symmetry II did not have a senior mortgage.  *Id.*, ¶¶ 40-41.

Corban Kauai received $282,000 in Chinese money from CBH, even though CBH was not a borrower.  *Id.*, ¶ 42.

Debtor defaulted on its obligation to Corban Kauai.  *Id.*, ¶ 43.

In 2019, Corban Kauai filed a foreclosure action in Hawaii state court, claiming a lien of approximately $13,000,000 based on the increased principal plus other fees.  *Corban Kauai Chicago Lender LLC v. SPD II Makaiwa Resort Development LLC*, Case No. 5CC1910000034 (Hawaii 5th Cir. Ct.).  *Id.*, ¶ 44.

The Hawaii state court judge ordered a foreclosure sale via public auction.  On May 31, 2023, the day before the scheduled auction, Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  *Id.*, ¶ 45; Case No. 23 B 7153, EOD 1.

6

Debtor listed the Hawaii Property on Schedule A/B.  Debtor did not include in its schedules the $7,500,000 borrowed from Symmetry II or the $26,400,000 which Debtor raised for CBH that was lent to Debtor by Symmetry II.  Complaint, ¶¶ 46, 48; Case No. 23 B 7153, EOD 22.

CBH filed a proof of claim on June 3, 2023, stating that it held a secured claim in the amount of $12,000,000.  Case No. 23 B 7153, Proof of Claim 1.

On March 15, 2024, CBH filed a motion under Fed. R. Bankr. P. 1009(a) seeking a hearing on whether the Debtor would be required to amend its schedules to include Coconut Beach/Hawaii LLC ("Motion to Amend Schedules").  About two weeks later, Debtor filed amended Schedules E/F listing "Coconut Beach/Hawaii, LLC" with a nonpriority, unsecured claim in the amount of $24,000,000.  The court then mooted the Motion to Amend Schedules. *Id.*, EOD 129, 139 and 145.

Corban Kauai filed an objection to Plaintiff's proof of claim.  On June 26, 2024, the court sustained Corban Kauai's objection, disallowing and expunging Plaintiff's proof of claim.  *Id.* at EOD 167, 210.

Debtor has never amended its schedules to reflect the $7,500,000 that it borrowed from Symmetry II to purchase the Hawaii Property.  Complaint, ¶ 49.

As the bankruptcy case progressed, Corban Kauai proposed a series of plans that ignored the wrongdoing by the Debtor with respect to Chinese investors.  The most recent plan proposed that Corban Kauai would receive 97-100% of the Hawaii Property while Chinese investors would take a pro rata share from a contingent carve-out of $300,000.  Under that plan, Chinese investors would have received nothing for the $7,500,000.  This would result in a $23 million

return on a $10 million investment for Corban Kauai and a $250,000 return on a $31 million investment for Chinese investors. *Id.*, ¶¶ 50-52.

In its fourth amended disclosure statement, Corban Kauai stated that "Debtor funded its ownership of the [Hawaii] Property through a loan with [Corban Kauai]." Corban Kauai did not enable the Debtor to purchase the Hawaii Property. Instead, Corban Kauai knowingly refinanced and perpetuated an unjust loan structure. *Id.*, ¶ 53; Case No. 23 B 7153, EOD 323, p. 12.

Corban Kauai knew that the Hawaii Property was wrongfully left unencumbered at the expense of Chinese investors whose money was used to buy the land. Corban Kauai papered over this in its dealings with the court. This gave Corban Kauai a greater recovery in a bankruptcy scenario. Corban Kauai was aware of this result and ratified it. Complaint, ¶¶ 57-58.

Plaintiff filed this adversary proceeding on August 18, 2025. About two months later, CBH filed an amended proof of claim, stating that it holds an unsecured claim in the amount of $24,000,000. Case No. 23 B 7153, EOD 379 and Amended Proof of Claim 1.

## III.    DISCUSSION

### A. Standard for a motion to dismiss for failure to state a claim

In the Motion to Dismiss, Corban Kauai asks the court to dismiss this one-count complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), made applicable by Fed. R. Bankr. P. 7012.

To defeat a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must describe the claim in enough detail to give notice to the defendant. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In addition, the claim for relief must be "plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

8

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint need only offer "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2).

**B.  Principles of Equitable Subordination under the Bankruptcy Code**

"[W]ithin the limits of the Code, courts may reorder distributions from the bankruptcy estate, in whole or in part, for the sake of treating legitimate claimants to the estate equitably." *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 24 (2000).  11 U.S.C. § 510(c) "allows a bankruptcy court to reduce the priority of a claim in bankruptcy." *In re Sentinel Mgmt. Grp., Inc.*, 809 F.3d 958, 964 (7th Cir. 2016).  *See also Matter of Lifschultz Fast Freight*, 132 F.3d 339, 344 (7th Cir. 1997) (if an insider's conduct "breached the rules of fair play and good conscience vis-a-vis the company and its creditors, the bankruptcy court can send her back to the end of the line") (quotation omitted).

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may--
>
>> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
>>
>> (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).  "The Seventh Circuit has ruled that creditor standing under § 510 is not derivative; individual creditors have an interest in subordination separate and apart from the interests of the estate as a whole." *NBD Park Ridge Bank v. SRJ Enters., Inc.* (*In re SRJ Enters., Inc.*), 151 B.R. 189, 196–97 (Bankr. N.D. Ill. 1993) (quotation omitted).

The analysis under § 510(c) "focuses on the behavior of a creditor, knocking down the status of a claim where a creditor engages in inequitable conduct." *In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 658 (7th Cir. 2010).  *See also In re Kreisler*, 546 F.3d 863, 866 (7th Cir. 2008)

("Equitable subordination allows the bankruptcy court to reprioritize a claim if it determines that the claimant is guilty of misconduct that injures other creditors or confers an unfair advantage on the claimant.").

> Although Congress included no explicit criteria for equitable subordination when it enacted § 510(c)(1), the reference in § 510(c) to 'principles of equitable subordination' clearly indicates congressional intent at least to start with existing doctrine…. In keeping with pre–1978 doctrine, many Courts of Appeals have continued to require inequitable conduct before allowing the equitable subordination of most claims[.]

*United States v. Noland*, 517 U.S. 535, 539 (1996).

As the Seventh Circuit recognized, "[t]he statute authorizing equitable subordination does not indicate what conduct justifies that Draconian remedy, but there is general agreement in the case law that the defendant's conduct must be not only 'inequitable' but seriously so ('egregious,' 'tantamount to fraud,' and 'willful' are the most common terms employed) and must harm other creditors." *Sentinel*, 809 F.3d at 965.

> Equitable subordination generally requires the satisfaction of three conditions: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) subordination must not be inconsistent with the provisions of the Bankruptcy Act.

*Kreisler*, 546 F.3d at 866 (quotations omitted).

### C. The Complaint plausibly alleges that Corban Kauai engaged in some type of inequitable conduct

The first element that Plaintiff must plausibly allege in the Complaint is that Corban Kauai engaged in some type of inequitable conduct. *Kreisler* characterized conduct that meets this standard as falling within one of three categories: "(1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) the claimant's use of the debtor as a mere instrumentality or alter ego." 546 F.3d at 866 (quotation omitted).

10

Whether Corban Kauai's loan was *actually* fraudulent or resulted in undercapitalization will be an issue that CBH must prove at trial. At this stage of the proceedings, CBH need only "allege facts which, when taken as true, plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quotation omitted).

The Complaint satisfies this low bar. It contains allegations that Corban Kauai's loan was an insider loan, based on the contention that Danielson was aligned with both the Debtor and Corban Kauai. Complaint, ¶ 29. The Complaint further alleges that Corban Kauai's loan "was part of a scheme whereby the insiders (Ding and Laytin) could deprive Chinese investors of collateral and thereby borrow more money on the [Hawaii] Property[.]" *Id.*, ¶ 33.

> The [Hawaii] Property should have been encumbered by a $7,500,000 mortgage in favor of [Symmetry II] alongside the JDI mortgage of $7,500,000…. [Since it was not, Corban Kauai,] as the subsequent lender, was afforded an outsized [equity] cushion and didn't have to compete with a mortgage of equal standing, even though the Chinese investors had lent more money to the Debtor and at an earlier time.
>
> [Corban Kauai] took advantage of this collateral cushion by lending more money to the Debtor on July 25, 2018, raising the loan principal to $9,914,000 and filing an amended mortgage to reflect the increased balance.
>
> [Corban Kauai] was able to *fully* secure this increase in principal … because [Symmetry II] did not [have a senior] mortgage.

*Id.*, ¶¶ 39-41. "[I]n reality [Corban Kauai] … knowingly refinanced and perpetuated an unjust loan structure." *Id.*, ¶ 53.

The Complaint also alleges that "Corban Kauai knew that Debtor was a start-up and not a going concern[.]" *Id.*, ¶ 34. Drawing a reasonable inference from this allegation in the light most favorable to the Plaintiff, Corban Kauai would have known that Debtor had no means to make payments before the loan came due. Indeed, the Complaint alleges that Corban Kauai lent more money to the Debtor in July 2018, filed an amended mortgage to secure this increased

11

balance, and then filed a foreclosure action the next year. *Id.*, ⁋⁋ 40, 44. Furthermore, the Complaint alleges that Corban Kauai was "told by Ding that their loan would be repaid with Chinese money if no senior loan was forthcoming[.]" *Id.*, ⁋ 34.

CBH frames the narrative in its Response, arguing that Corban Kauai's loan "was inherently fraudulent – it was designed so that the Debtor would default, and [Corban Kauai] would rack up loan extensions, which it would collect by filing a foreclosure proceeding, where [Corban Kauai] would seize all of the debtor's assets." Response, p. 8 (footnote omitted). Corban Kauai's plan was "to continue loaning money to the Debtor up to the point where it could then file a foreclosure action and take its profit from the myriad default interest, exit fees, and various other costs, thereby leaving the Debtor undercapitalized and unable to pay other creditors." *Id.*, p. 9. This argument is supported by the allegations in paragraphs 57 and 58:

> [Corban Kauai] knew that the [Hawaii] Property was wrongfully left
> unencumbered at the expense of Chinese investors whose money was used to buy
> the land. [Corban Kauai] papered over this … in its dealings in this Court.
>
> ….[This gave Corban Kauai] a greater recovery in a bankruptcy scenario, and
> [Corban Kauai] was aware of this [result] and ratified it.

Complaint, ⁋⁋ 57-58. Viewing these allegations in the light most favorable to the Plaintiff, the reasonable inference is that the Debtor and Corban Kauai hid the inequitable origins of Corban Kauai's position so that it could fare better than other creditors.

CBH may have an uphill battle at trial to satisfy its burden of proving that Corban Kauai did more than exercise its negotiated, contractual rights. The Seventh Circuit has stated that it is "not willing to embrace a rule that requires participants in commercial transactions not only to keep their contracts but also do 'more[.]'" *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1356 (7th Cir. 1990). *See also SRJ Enters.*, 151 B.R. at 197 ("because

12

there generally is no duty of kindness among nonfiduciaries, mere enforcement of contract rights will not give rise to a claim for equitable subordination") (quotation omitted).

At this stage of the proceedings, however, CBH need only *plausibly allege* that Corban Kauai engaged in inequitable conduct. "In other words, the court will ask itself *could* these things have happened, not *did* they happen." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). Taking all of the well-pleaded allegations in the Complaint as true and viewing reasonable inferences in the light most favorable to CBH, this standard has been met.[3]

D. **The Complaint plausibly alleges that the misconduct resulted in injury to Debtor's creditors or conferred an unfair advantage on Corban Kauai.**

As the Seventh Circuit explained in *Kreisler*, the defendant's inequitable conduct must harm other creditors or confer an unfair advantage to justify subordination of a claim. 546 F.3d at 865 ("Equitable subordination is generally appropriate only if a creditor is guilty of misconduct that causes injury to the interests of other creditors."). The Complaint plausibly alleges this element.

In paragraphs 39 through 41, CBH alleges that the Hawaii Property should have been encumbered by a $7,500,000 mortgage in favor of Symmetry II, equal in time to JDI's mortgage. Since it was not, Corban Kauai, as the subsequent lender, was afforded an outsized equity cushion and did not have to compete with a mortgage of equal standing. Corban Kauai took advantage of this cushion by lending more money to the Debtor, increasing its loan principal and filing an amended mortgage to reflect the increased balance. Corban Kauai was able to fully secure this increase in principal because Symmetry II did not have a senior mortgage.

---

[3] The court need not address CBH's alternative argument in the Response that the Complaint alleges conversion by Corban Kauai. The allegations in the Complaint satisfy the requirement of plausibly alleging inequitable conduct. Whichever theory Plaintiff chooses to pursue after discovery and at trial can be addressed at the appropriate time.

Therefore, Plaintiff plausibly alleged in the Complaint that Corban Kauai's inequitable conduct conferred an unfair advantage on it.

### E. The Complaint plausibly alleges that subordination is not inconsistent with the provisions of the Bankruptcy Code.

This element has been described by the Supreme Court "as a reminder to the bankruptcy court that although it is a court of equity, it is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives that the result is inequitable." *Noland*, 517 U.S. at 539 (quotation omitted).

As Corban Kauai states in the Motion to Dismiss, "[t]he question of whether to equitably subordinate a claim must be made on a case-by-case basis, with a focus on fairness to other creditors." Motion to Dismiss, ⁋ 37. Subordinating a creditor who allegedly engaged in inequitable conduct that harmed another creditor is not inconsistent with the provisions of the Bankruptcy Code. *See In re J.S. II, L.L.C.*, 389 B.R. 570, 581 (Bankr. N.D. Ill. 2008) ("[I]f [plaintiff] succeeds in asserting his subordination claim, it would be consistent with the Code's general good faith requirements, meeting the third prong.").

If the facts proven at trial support the allegations in the Complaint, then subordination would be an appropriate remedy. That determination will come only after Plaintiff has an opportunity to meet its burden of proof.

### F. Failure to Cite Legal Authority is not a Basis for Dismissal

Corban Kauai argues that Plaintiff fails to cite any legal authority to support its position. *See* Motion to Dismiss, ⁋ 45. That is not fatal to the Complaint. The Seventh Circuit has "stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned during discovery." *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011).

## IV.   CONCLUSION

In order to state a claim for equitable subordination and to survive a motion to dismiss, the Complaint must plausibly allege that Corban Kauai engaged in some type of inequitable conduct.  This conduct must have resulted in injury to Debtor's creditors or conferred an unfair advantage on Corban Kauai.  Finally, subordination must not be inconsistent with the provisions of the Bankruptcy Code.  Viewing the allegations in the Complaint in the light most favorable to the Plaintiff, the court finds that this low threshold has been satisfied.  The court will deny the Motion to Dismiss, and the parties may proceed with discovery.

Corban Kauai has been named as an Alternate Bidder by the Debtor's chapter 7 trustee. *See* Case No. 23 B 7153, EOD 443.  The court is aware that one condition of Corban Kauai's bid is the dismissal or other acceptable disposition of this adversary proceeding.  *Id.*  In order to keep the sale process moving forward, so that the trustee can "close [the] estate as expeditiously as is compatible with the best interests of parties in interest[,]" 11 U.S.C. § 704(a)(1), this adversary will proceed on an expedited schedule.

For the reasons stated above, **IT IS ORDERED THAT**:

1. The Motion to Dismiss is **DENIED**;

2. Status on this adversary proceeding is set for **May 6, 2026 at 9:30 a.m.**;

3. Corban Kauai shall file an answer on or before **April 29, 2026**; and

4. At the hearing on May 6, 2026, the parties shall present a proposed timeline for discovery and suggested dates for trial.

ENTERED:

Date:   April 8, 2026

_____
DAVID D. CLEARY
United States Bankruptcy Judge

15